IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| ANDREW and LAUREN HACKNEY, | CIVIL DIVISION |
| Plaintiffs, | |
| | G.D. No. 23-013180 |
| v. | |
| ALLEGHENY COUNTY, MICHELLE VESELICKY, JENNA REED, LINDA FINE, and SARAH HART, | **COMPLAINT IN CIVIL ACTION** |
| Defendants. | |
| | **JURY TRIAL DEMANDED** |

Filed on Behalf of Plaintiffs

ANDREW and LAUREN HACKNEY

Counsel of Record for this Party:

Margaret S. Coleman, Esquire
Pa. ID No. 200975

Alec B. Wright, Esquire
Pa ID No. 316657

O'BRIEN COLEMAN & WRIGHT, LLC
116 Boulevard of the Allies
Pittsburgh, PA 15222
(412) 232-4400
(412) 232-3730 (fax)
maggie@ocwjustice.com

Exhibit A

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| ANDREW and LAUREN HACKNEY, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiffs, | ) | |
| | ) | G.D. No. 23-013180 |
| v. | ) | |
| | ) | |
| ALLEGHENY COUNTY, MICHELLE | ) | JURY TRIAL DEMANDED |
| VESELICKY, JENNA REED, LINDA | ) | |
| FINE, and SARAH HART, | ) | |
| | ) | |
| Defendants. | ) | |

AND NOW, come the Plaintiffs, ANDREW and LAUREN HACKNEY, by and through their attorneys, MARGARET S. COLEMAN, ALEC B. WRIGHT and the law firm of O'Brien, Coleman and Wright, LLC and hereby file the within Complaint in Civil Action as follows:

### INTRODUCTION

1.     This Complaint alleges that employees of the Allegheny County Office of Children, Youth and Families (CYF) engaged in an unlawful and unconstitutional scheme to terminate the parental rights of an intellectually disabled couple so that a non-disabled couple could adopt their child.  In furtherance of this scheme, CYF employees, *inter alia*, ignored court orders, presented false and misleading testimony, suppressed evidence, withheld services, subjected the parents to excessive scrutiny and imposed arbitrary and inconsistent restrictions on contact with their daughter.  This Complaint alleges that these employees knew that the couple were able to care for their daughter but engaged in the unlawful scheme because they believed she was better off with a non-disabled couple.

2.     Plaintiffs Andrew and Lauren Hackney (the "Hackneys") both have intellectual disabilities.  In November 2021, they sought medical treatment for their infant daughter, K.H.

<span style="color:red">Exhibit A</span>

Even though the Hackneys had an established history of appropriately caring for K.H., CYF took K.H. from the Hackneys and placed her in foster care. CYF's sole basis for taking custody of K.H. was its belief that the Hackneys' intellectual disabilities prevented them from properly caring for her. For more than two years, the Hackneys have complied with CYF's ever-increasing demands and have proven that they are able to care for their daughter. They have complied with court orders, spent hundreds of hours driving to weekly supervised visitation, worked with parenting coaches and disability support specialists, submitted to psychological evaluations and intelligence tests, attended and testified at hearings, and spent thousands of dollars on attorneys.

3.      Even though the Hackneys have proven that they can care for K.H., CYF and its caseworkers have actively undermined them and prevented them from reuniting with their daughter. CYF has routinely presented false and misleading evidence that the Hackneys' disabilities prevent them from caring for K.H., while suppressing evidence that the Hackneys are able to parent their daughter without assistance. CYF has insisted that the Hackneys take part in disability-related services and then prevented them from receiving those services. CYF has routinely ignored court orders and opposed efforts toward reunification. CYF has imposed onerous expectations and requirements on the Hackneys that go well beyond ordinary parental expectations.[1] CYF reports them as "non-compliant" when they fall short of its unreasonable demands. When they meet those demands, CYF raises the bar and demands more.

---

[1] As of the fall of 2023 CYF required the Hackneys to, *inter alia*:

a.  Regularly attend K.H.'s speech therapy, developmental therapy, occupational therapy, physical therapy and early intervention services appointments at locations that are more than a half hour's drive from the Hackneys' home.

b.  Call off of work to attend appointments which were scheduled during their work hours.

4.      CYF's efforts to destroy the Hackneys' family have been cruel, unjust, and unconscionable.  This Complaint alleges that CYF and its caseworkers have unlawfully interfered with the integrity of the Hackneys' family in violation of the Due Process Clause of the United States Constitution.  This Complaint further alleges that CYF and its caseworkers unlawfully discriminated against them by removing their daughter from their custody because of their disabilities and working to facilitate her adoption by a non-disabled couple.

### PARTIES

5.      The Hackneys are adult residents of Allegheny County, Pennsylvania.

6.      Defendant Allegheny County ("Allegheny County") is a Pennsylvania County of the Second Class which operates CYF.  Allegheny County was, at all times relevant, acting by and through its duly authorized agents, employees and/or assigns, who were acting within the course and scope of their employment, under the color of state law and in accordance with the customs, policies and practices of Allegheny County.

7.      Defendant Jenna Reed ("Reed") was, at all times relevant, a CYF caseworker employed by Allegheny County and a resident of the Commonwealth of Pennsylvania.  With

---

c.  Incorporate K.H.'s therapies into each of their visits by learning and using signs to communicate with K.H., playing developmentally appropriate games with her and doing exercises recommended by her physical and occupational therapists.

d.  Confirm their visits by 4pm the evening before and arrive exactly on time for every appointment or visit, regardless of their work schedules or traffic.

e.  Plan a nutritious menu for every visit that included only foods which K.H. likes to eat but does not include foods with "too much" sugar.

f.  Ensure that K.H. ate an appropriate amount of food at every visit, while not pressuring her to eat, not removing her tray before she was done and only allowing her to eat during specified times when a visit supervisor was able to observe her.

g.  Track what they fed K.H. for every meal and exactly how much she eats of every item by weighing it on a food scale and then logging that information in a notebook.

respect to the events alleged herein, this Defendant was acting under the color of state law and in accordance with the customs, practices and/or policies of the Allegheny County.  This Defendant is sued in her individual and official capacity.

8.    Defendant Michelle Veselicky ("Veselicky") was, at all times relevant, a CYF casework supervisor employed by Allegheny County and a resident of the Commonwealth of Pennsylvania.  With respect to the events alleged herein, this Defendant was acting under the color of state law and in accordance with the customs, practices and/or policies of the Allegheny County. This Defendant is sued in her individual and official capacity.

9.    Defendant Michele Haney (Haney) was, at all times relevant, a CYF casework supervisor employed by Allegheny County and a resident of the Commonwealth of Pennsylvania. With respect to the events alleged herein, this Defendant was acting under the color of state law and in accordance with the customs, practices and/or policies of the Allegheny County.  This Defendant is sued in her individual and official capacity.

10.    Defendant Emma Embar (Embar) was, at all times relevant, a CYF caseworker employed by Allegheny County and a resident of the Commonwealth of Pennsylvania.  With respect to the events alleged herein, this Defendant was acting under the color of state law and in accordance with the customs, practices and/or policies of the Allegheny County.  This Defendant is sued in her individual and official capacity.

11.    Defendant Monica Anderson-Rhones (Anderson-Rhones) was, at all times relevant, a CYF caseworker employed by Allegheny County and a resident of the Commonwealth of Pennsylvania.  With respect to the events alleged herein, this Defendant was acting under the color of state law and in accordance with the customs, practices and/or policies of the Allegheny County. This Defendant is sued in her individual and official capacity.

Exhibit A

## FACTUAL BACKGROUND

### *The Hackney Family*

12.     K.H. was born to Lauren and Andrew Hackney on February 9, 2021.

13.     At the time of K.H.'s birth, the Hackneys resided in a single-family house with Andrew's mother, Cynthia Hackney, and his sister, Stephanie Hackney.[2]  The Hackneys shared responsibility for caring for K.H.  As first-time parents they relied on Cynthia for help, advice, and support.

14.     Andrew is diagnosed with borderline intellectual functioning and a post-stroke neurocognitive disorder.  Lauren is diagnosed with a mild intellectual disability and anxiety. Stephanie suffers from a more significant intellectual disability.  Cynthia has no intellectual disabilities.

15.     Following K.H.'s birth, Andrew worked full-time at Giant Eagle as a lot attendant and Lauren worked mornings and evenings at a hotel.  The Hackneys intended to live with Cynthia for a few years in her home so that Cynthia could help take care of K.H. and they could save money.

16.     The Hackneys took K.H. to all of her regularly scheduled well-baby visits.  Every pediatrician who examined K.H. during these visits noted that the Hackneys were feeding K.H. proper amounts of formula at proper intervals (every three to four hours) and that K.H. was healthy. The pediatricians also recorded that the Hackneys were supportive of each other, were comfortable caring for K.H., were responsive to her needs, and had a support network.

---

[2] For the sake of clarity, members of the Hackney family will sometimes be referred to by their first names only.

17.     On August 18, 2021, when K.H. was approximately six months old, the Hackneys took K.H. to her pediatrician for evaluation because her appetite had decreased.  The pediatrician reassured the Hackneys that she "looks and sounds well at this time" and recommended that they give her Pedialyte and continue to monitor her.

### *When K.H. Became Ill, the Hackneys Sought Medical Care*

18.     October 25, 2021, Lauren and Cynthia Hackney took K.H. back to her pediatrician for evaluation because she had been refusing her bottle and they had difficulty getting her to eat. Because of COVID restrictions, only Lauren could go with K.H. into the office.  Cynthia gave Lauren a typewritten paper with a history of K.H.'s symptoms and the things they had tried to do for her, in case Lauren forgot something or had difficulty explaining K.H.'s illness to the doctor.

19.     The pediatrician diagnosed K.H. with dehydration and advised Lauren to take K.H. to Childrens' Hospital of Pittsburgh ("CHP") for further evaluation and treatment.

20.     Andrew immediately left work so that he and Lauren could take K.H. to CHP. Cynthia met them there later that evening.  Although the Hackneys acted immediately upon their pediatrician's advice, they waited approximately five hours to be seen by a physician at CHP.

21.     CHP admitted K.H. for inpatient treatment where she remained until November 8, 2021.  Although Andrew Hackney continually asked CHP for information about K.H.'s condition, CHP personnel provided very little explanation about her medical state.  On information and belief, CHP staff did not provide the Hackneys with medical information about K.H. because they concluded that, because of their intellectual disabilities, the Hackneys would not understand.  On information and belief, CHP did not discharge K.H. because CHP personnel concluded that because of their intellectual disabilities, the Hackneys should not be allowed to take her home.

Exhibit A

22.     On or about November 8, 2021, CHP transferred K.H. to Children's Home of Pittsburgh ("Children's Home").  Neither CHP nor Children's Home explained to the Hackneys why K.H. was being transferred.

23.     The Hackneys attended to K.H. around the clock while she was admitted to CHP and Children's Home.  Either Lauren, Andrew, Cynthia or Stephanie were continually present with her.  Lauren and Andrew slept at the facilities with K.H. every night.

***CYF Becomes Involves and Immediately Determines that the Hackneys Should Not be Allowed to Care for K.H. Because of Their Disabilities***

24.     On November 10, 2021, CYF received a Childline referral regarding K.H. which stated that, "Both parents and the aunt who lives in the household have intellectual disabilities. They do not appear to understand that [K.H.] needs to be fed more often.  They are struggling to feed her as often as she needs."  On information and belief, Children's Home staff made this referral.

25.     On November 15, 2021, CYF Caseworker Reed traveled to the Children's Home to investigate the November 10, 2021 report.  Upon her arrival, a nurse who was working at the desk told Reed that she "would not send [K.H.] home with this family" because "they all seem to have disabilities."

26.     On November 15, 2021, Reed interviewed Andrew's sister, Stephanie Hackney, at Children's Home.  Neither Andrew, Lauren nor Cynthia was present at the time.  Despite her obvious intellectual disability, Reed asked Stephanie questions about her medical history, diagnoses, and medication. Stephanie Hackney was clearly confused and scared.  Stephanie referred Reed to Cynthia for answers to her questions.

27.     On November 16, 2021, Reed returned to Childrens' Home to interview Lauren and Andrew Hackney.  She made them go into separate rooms for the interviews.  Reed asked them

questions about their medical history, diagnoses, and medications.  Lauren told Reed that she was diagnosed with ADHD and Andrew told her that he had a neurocognitive disorder related to a stroke.

28.     Both Lauren and Andrew told Reed that they lived with Cynthia and that she provided them with substantial advice and support regarding K.H.  Reed interviewed Cynthia but did not record any notes of this interview.

29.     Reed falsely recorded in her notes that the Hackneys were only feeding K.H. two to three times per day total, that Stephanie was a primary caregiver for K.H. while the rest of the family was at work, that Stephanie regularly forgot to feed K.H. and that Andrew and Lauren had no concerns about this.

30.     Lauren, Andrew, and Cynthia had each told Reed that *they* fed K.H. two to three times per day—totaling six to nine feedings per day.  None of them told Reed that K.H. was only being fed two or three times a day total.  None of them told Reed that Stephanie was a primary caregiver for K.H. or spent significant amounts of unsupervised time with K.H.

31.     Although Reed had the Hackneys complete medical releases for K.H., she did not obtain K.H.'s pediatric records or speak with employees of CHP regarding K.H.'s condition.  Thus, she had no medical basis to conclude that K.H.'s illness was related to the Hackneys' disabilities.

### *CYF Removes K.H. from the Hackneys' Care and Places Her into Foster Care with a Non-Disabled Family*

32.     On November 17, 2021, Reed's supervisor, Veselicky, filed an application for emergency protective custody of K.H. based on the Hackneys' disabilities, stating, in part, "Mother and Father appear to have intellectual disabilities, but deny significant issues."

33.     Despite the fact that the Hackneys had a documented history of properly feeding K.H., took her to her pediatrician twice with concerns about her refusal to eat, and immediately

took her to CHP upon her pediatrician's recommendation, Veselicky stated, "No adult caretaker in the home recognized that the child was not been [sic] fed enough food . . ." and "the parents do not appear to recognize the severity of the child's condition and that it is a result not being fed."

34.     Veselicky also falsely stated that the Hackneys waited a week to take K.H. to her pediatrician because "father did not want to take time off work to take the child to the PCP."

35.     On November 18, 2021, Veselicky met with the Hackney Family at Children's Home.  She told them that K.H. had nearly died from dehydration because they did not feed her enough and no one in the household recognized that she was sick.  She told them K.H. was unsafe in their home and that CYF was going to place her in foster care immediately.  She gave the Hackneys one hour to say goodbye to their infant daughter.

36.     CYF then gave K.H. to a stranger who took her home.

37.     A CYF caseworker asked the Hackneys if they had any family or friends who could care for K.H.  Rather than have K.H. remain in the custody of a total stranger, the Hackneys suggested family friends who they knew had fostered a child before (hereinafter "Foster Parents").

38.     On November 18, a CYF employee contacted Foster Parents.  Foster Parents told CYF that they were willing to care for K.H. *indefinitely*.  Foster Parents have no diagnosed intellectual disabilities.

### *CYF Fights to Keep K.H. Away from the Hackneys Because of Their Disabilities*

39.     On November 18, 2021, Veselicky filed a Shelter Care Application which contained the same false allegations as the Emergency Custody Application.

40.     A shelter hearing was held on November 19, 2021.  CYF's sole focus at the hearing was the Hackneys' intellectual disabilities.

41.     Reed testified multiple times that CYF believed that Andrew, Lauren and Stephanie Hackney had intellectual disabilities which rendered them unable to care for K.H.  Reed supported these statements with false and misleading testimony regarding her interactions with the Hackneys including that, "every adult in the house thought that it was normal to only feed the baby two or three times a day," and that no adult living in the house recognized that K.H. was not eating.

42.     CYF recommended that the Hackneys be assessed for appointment of *guardians ad litem* because of their intellectual disabilities, implying that they were mentally incompetent.

43.     CYF recommended that K.H. remain in foster care with only supervised visitation until Andrew, Lauren and Stephanie Hackney were all assessed for intellectual disabilities.

44.      In reliance on Reed's false testimony, the court granted CYF's Shelter Care Application, ordering CYF to, *inter alia*,

      a.      assess the Hackneys for further services,

      b.      refer the Hackneys to coached parenting,

      c.      train the Hackneys to address K.H.'s needs,

      d.      refer the Hackneys to in-home services,

      e.      assess the other adults residing in the Hackneys' home for ongoing services, and

      f.      assess the Hackneys' home.

45.     On November 24, 2021, CYF filed a Dependency Petition.  The petition again stated the Hackneys "appear to have intellectual disabilities, but deny significant issues."

46.     A dependency adjudication hearing was scheduled for December 8, 2021.  This hearing was postponed multiple times because Allegheny County either had not appointed an attorney for Andrew Hackney or his court-appointed counsel was unready to proceed.  The dependency hearing did not occur until March 8, 2022.

Exhibit A

47.    On November 30, 2021, Reed met with Andrew, Lauren and Cynthia Hackney at Cynthia's house.  Reed noted that the home was clean and well-maintained with working utilities. She also noted that K.H. had her own bedroom with lots of toys and clothes, as well as a pack and play and a twin bed for when K.H. was older.

### *CYF Intentionally Places K.H. into a "Foster-to-Adopt" Program with the Non-Disabled Foster Parents*

48.    On December 7, 2021, CYF placed K.H. with Foster Parents.

49.    CYF arranged K.H.'s placement with Foster Parents through an agreement and/or contractual arrangement with Adoption Connections, PA ("Adoption Connections").

50.    On its website, Adoption Connections lists "fostering to adopt" as one of the services it provides.  "Fostering to adopt" describes an arrangement where prospective parents foster a child with the hope and intent to adopt the child.  The adoption can only occur if the biological parents' rights are terminated.

51.    On information and belief, Foster Parents had previously fostered a child through Adoption Connections' "foster to adopt" program, but that child was returned to its birth parents over the Foster Parents' objection.

52.    On information and belief, Adoption Connection and CYF, through Reed and/or Veselicky, represented to Foster Parents that they would work together to help Foster Parents adopt K.H.

53.    Neither Reed nor Veselicky informed the Hackneys that Foster Parents intended to adopt K.H.

54.    Had the Hackneys known that Foster Parents intended to adopt K.H., they would not have requested that CYF place K.H. with Foster Parents.

### *CYF Begins Demanding Onerous Restrictions and Requirements over the Hackneys*

Exhibit A

55.     Reed and/or Veselicky unilaterally required that all of the Hackneys' visits with K.H. take place at the Foster Parents' home.2

56.     The Foster Parents' home was over an hour's drive round trip from Cynthia Hackney's home.  CYF required the Hackneys to make this trip weekly to visit with K.H.  The Hackneys owned a car, but only Andrew had a driver's license.

57.     Initially, Foster Parents only supervised the Hackneys' visits.

58.     Beginning with the Hackneys' first visit, on December 9, 2021, Foster Parents repeatedly contacted Reed to report minor complaints about the Hackneys.  Foster Parents reported, *inter alia*, that the Hackneys did not understand K.H.'s word for "bottle" or her "hungry cry," did not hold the spoon close enough to K.H.'s mouth, prepared 6-ounce instead of 8-ounce bottles, wiped K.H. side-to-side instead of front-to-back, and did not play with her "in a way that would help her development."

59.     Notably, Foster Parents did not report that the Hackneys engaged in any behavior which presented a substantial risk of harm to K.H. during their visits.

60.     In or about late December 2022, Erin Jinkins ("Jinkins"), an early intervention specialist from Access Abilities, Inc. began to attend some of the Hackneys' visits at the Foster Parents' home.  On information and belief, Jinkins' services were arranged through Adoption Connection with CYF's participation and/or approval.

61.     Early intervention specialists work with developmentally delayed infants and toddlers.  Jinkins had no training or experience working with parents with intellectual disabilities and was not qualified to provide disability-related parenting services to the Hackneys.

62.     The Hackneys' visits were limited to a small area in the Foster Family's cluttered living room.  Usually both Foster Parents, the Foster Father's disabled father, and Jinkins, were

present in the living room during the visits, leaving the Hackneys with little space to interact and play with K.H.

63.     Foster Parents and Jinkins were openly hostile to the Hackneys during their visits.

64.     Foster Parents and Jinkins interfered with the Hackneys' attempts to parent K.H. during their visits by continually interrupting them with criticism, redirection and/or prompting.

65.     Visits to the Foster Parents' home were awkward and uncomfortable for the Hackneys and prevented them from interacting naturally with K.H.

66.     The Hackneys were afraid to complain about Foster Parents' and Jinkins' treatment of them because they did not want CYF to view them as uncooperative.

67.     Reed communicated regularly with Jinkins and Foster Parents and solicited feedback about the Hackneys' behavior and parenting during visits.  Foster Parents and Jinkins provided Reed with negative information about the Hackneys' behavior and parenting skills which was either false or greatly exaggerated.  Reed recorded this information in the Hackneys' file without verifying it.

68.     On February 28, 2022, Reed provided the Hackneys with identical "Family Plans" which purported to explain what the Hackneys needed to do to regain custody of K.H. On information and belief, these Family Plans were created by Reed and approved by Veselicky. Reed created the Family Plans without consulting the Hackneys or seeking their input.

69.     On the Plans, Reed listed the "Desired Family Outcome" as "CYF involvement to end" and provided the same "Needs" and "Action Steps" for both Andrew and Lauren Hackney.

70.     The first "Need" was "An evaluation needs completed to make sure the caregiver is in the correct level of parenting class."  The "Action Step" was "attend an evaluation and follow

through with the recommendations." The "evaluation method" was "OCYF to follow up once the evaluation is complete and make all necessary referrals."

71.     The second "Need" was "Learning to feed [K.H.] and recognizing when she is hungry. As well as improving parenting skills over all [sic] and understanding communication with a child." The "Action Step" was "complete coached parenting." The "evaluation method" was "Reports from the coach parent and foster parents."

72.     The Family Plans also stated that a "Barrier" to these goals was "waitlist."  The suggested solution was, "Be patient and continue to visit with the child at the foster parents' home."

73.     This is the only Family Plan the Hackneys ever received.

74.     According to the Family Plan, until CYF evaluated them and provided them with a parenting coach, the Hackneys could do nothing to regain custody of K.H.

75.     The permanency review hearing which had been scheduled for December 8, 2021, was finally held on March 8, 2022.

76.     As of March 8, 2022, K.H. had been separated from the Hackneys and living in foster care for nearly four months because of CYF's belief that the Hackneys' disabilities prevented them from caring for her.

77.     As of March 8, 2022, CYF had not completed individualized assessments of the Hackneys' ability to care for K.H. and had not provided the Hackneys with any disability-related parenting services.

78.     As of March 8, 2022, CYF had provided the Hackneys with no services whatsoever.

79.     Before the hearing, on March 2, 2022, Reed submitted a report to the court in which she blamed CYF's failure to provide the Hackneys with coached parenting on Lauren Hackney's

"confusion." At the hearing, she acknowledged that coached parenting had not begun because CYF had not arranged transportation for K.H.

80.     In her report on March 2, 2022, and her testimony on March 8, 2022, Reed communicated the negative information that Jinkins and the Foster Parents had provided to her to the court.

81.     Reed testified that CYF opposed any unsupervised visits with the Hackneys because it believed their intellectual disabilities prevented them from safely caring for K.H. Reed acknowledged that CYF had made no effort to have the Hackneys' evaluated to determine what, if any, level of intervention they required.

82.     Reed recommended that the Hackneys be evaluated for services from Achieva, a non-profit organization that provides services to individuals with disabilities.

83.     Based on Reed's testimony and CYF's recommendation, the court ordered that K.H. remain in the custody of Foster Parents while the Hackneys participated in coached parenting and completed evaluations with Achieva.

### *CYF Suppresses Positive Reports from the Hackneys' Parenting Coach*

84.     In or about late March 2022, the Hackneys and K.H. began attending weekly two-hour coached parenting visits with Alicia Lackey ("Lackey").

85.     Because CYF would not permit the coached visits to take place in Cynthia Hackney's home, the Hackneys rented a two-bedroom apartment. After the Hackneys moved, CYF moved the coached parenting visits to their apartment.

86.     The role of a parent coach is to help parents develop parenting skills and knowledge and to provide a resource to answer questions and provide suggestions.

87.    Parent coaching is not a disability-specific service and Alicia Lackey had no specific training in assessing parents' disabilities or working with intellectually disabled parents.

88.    The support that Alicia Lackey provided to the Hackneys was the same as, or very similar to, the support that Cynthia Hackney provided before CYF took custody of K.H.

89.    Alicia Lackey completed notes after each visit with the Hackneys.  These notes reflected that the Hackneys were doing well with K.H. and showed steady improvement.  Lackey's notes reflected that the Hackneys were cooperative and engaged and incorporated her suggestions and feedback.  Lackey's notes reflected that after the first few visits, the Hackneys required little or no prompting or feedback from her.

90.    Lackey uploaded her notes to CYF's electronic case management system (referred to as "KIDS") within a week after each visit. Lackey's notes were available to all CYF caseworkers, including Reed and Veselicky, through the KIDS system.

91.    Reed only spoke with Lackey one time, shortly after her first visit with the Hackneys.  Reed made no other attempts to contact Lackey and did not request any additional information from her.

92.    Lackey attempted to contact both Reed and Veselicky multiple times to discuss the Hackneys' progress.  No one from CYF returned her calls and emails.

### *CYF Continues to Present False and Misleading Information about the Hackneys*

93.    A permanency review hearing was held on June 9, 2022.

94.    As of June 9, 2022, K.H. had been living in foster care for approximately seven months because of CYF's belief that the Hackneys' disabilities prevented them from caring for her.

95.     As of June 9, 2022, CYF had not completed an individualized assessment of the Hackneys' ability to care for K.H., had not assessed the Hackneys need for disability-related services, and had not provided them with any disability-related services.

96.     Prior to the hearing on June 9, 2022, on June 3, 2022, Reed submitted a supplemental report which falsely stated that the "professionals" who supervised the Hackneys' visits had concerns about their ability to parent K.H. and meet her needs.  Reed deliberately omitted Lackey's reports that the Hackneys were making steady progress and included negative information from Jinkins and Foster Parents, including Jinkins's opinion that "there has been little to no progress with Mr. Hackney and Ms. Hackney interactions and parenting of [K.H.]."

97.     CYF did not inform Lackey of the June 9, 2022 hearing.

98.     At the hearing, Reed falsely testified that Lackey had not responded to her emails, had not uploaded her notes to KIDS and had not provided her with information about the Hackneys' progress.

99.     CYF called Jinkins to testify.  Jinkins testified that she constantly prompted and redirected the Hackneys during their visits at Foster Parents' home.  Though she had never given the Hackneys the opportunity to parent K.H. without her interference, she questioned whether they were ". . . cognitively able to take care of K.H. without additional assistance from a coach like me or somebody from Achieva."

100.    At the hearing, Reed testified that she had referred the Hackneys to Achieva for evaluation and that they were on a waitlist.  This testimony was false.  Reed never referred the Hackneys to Achieva.  Nearly a year later, in February of 2023, Achieva's Associate Director informed Ms. Hackneys' attorney that the organization had received no referral from CYF related to the Hackneys and the Hackneys had never been on a waitlist.

101.    Reed testified that CYF remained concerned about the Hackneys' intellectual functioning and recommended that the Hackneys be ordered to complete psychological evaluations and I.Q. testing.

102.    Based on Reed's testimony and recommendations, the Court entered an order noting that the parents were on the Achieva waitlist and ordering CYF to refer them for psychological evaluations and disability assessments that included I.Q. testing.

103.    Following the June 9, 2022 hearing, Lackey continued to upload notes showing that the Hackneys required little or no assistance from her during their visits with K.H.  She also continued to attempt to contact Reed and Veselicky to discuss the Hackneys' progress.  Neither Reed nor Veselicky responded to her calls and emails.

104.    Lackey wanted to testify at the Hackneys' next hearing but did not believe that CYF would notify her, so she asked the Hackneys attorney to notify her.

105.    The next permanency review hearing took place on September 1, 2022.

106.    Shortly before the September 1, 2022 hearing, CYF assigned a new caseworker, Emma Embar, and a new casework supervisor, Michele Haney, to the Hackneys' case.

107.    As of September 1, 2022, K.H. had been living in foster care for approximately ten months because of CYF's belief that the Hackneys' disabilities prevented them from caring for her.

108.    As of September 1, 2022, CYF had not completed an individualized assessment of the Hackneys' ability to care for K.H., had not assessed the Hackneys' need for disability-related services and had not provided them with disability-related services.

109.     As of September 1, 2022, CYF had not established any plan to return K.H. to the Hackneys' custody and had not explained to the Hackneys what they needed to do to regain custody of K.H. other than the directive in the February 8, 2022 Family Plan to "be patient."

110.     At the September 1, 2022 hearing, Haney falsely testified that CYF had referred the Hackneys to Achieva and that they were on a waitlist.

111.     Haney acknowledged that CYF had not met with the Hackneys to go over CYF's goals and expectations for them.

112.     Haney was not familiar with the case file and was unable to answer specific questions from Ms. Hackney's attorney regarding the Hackneys' parenting abilities or their progress during the previous seven months.  Nevertheless, she recommended that the Hackneys' three-hour visits at Foster Parents' home be reduced to two hours to assist K.H. in transitioning back to Foster Parents.  Haney was unable to provide a coherent explanation of why this change was necessary.  On information and belief, Haney made this recommendation at Foster Parents' request because K.H. was becoming too attached to the Hackneys during their three-hour visits.

113.     CYF did not notify Lackey of the September 1, 2022 hearing.

114.     Believing that Lackey would not appear at the hearing because she had not been notified, Haney falsely testified that Lackey had been unresponsive and had not provided any information about the Hackneys' coached parenting sessions.

115.     Lackey, who had been notified about the hearing by one of the Hackneys' attorneys, appeared and testified, *inter alia*, that the Hackneys were "doing a great job" and she had no concerns about them whatsoever.

116.   Jinkins testified, *inter alia*, that she did not support allowing the Hackneys unsupervised time with K.H. because sometimes when K.H. told them she was done, they would take her out of her highchair until she "intervened" and made them feed her more.

117.   Following the September 1, 2022 hearing, the Court entered an order which was substantially similar to its June 9, 2022 order.

118.   Shortly after the September 1, 2022 hearing, Foster Parents began reporting to CYF that K.H. was experiencing diarrhea after her visits in the Hackneys' apartment.  Foster Parents accused the Hackneys of poisoning K.H. with spoiled food.  The Hackneys' visits were entirely supervised by Lackey and the Hackneys were required to document everything that they fed K.H. When Lackey asked whether they should do anything different during their visits, she was told "no."

119.   CYF caseworkers knew that the Foster Parents' allegations were likely false and made for the purpose of interfering with the Hackneys efforts to reunify with K.H.  Nevertheless, CYF repeated these accusations at later hearings.

### *Psychological Report and IQ Testing of the Hackneys and Subsequent Hearings*

120.   On November 14, 2022, Dr. Gregory Lobb completed the psychological evaluations of the Hackneys that the Court had ordered CYF to complete in June.  He diagnosed Ms. Hackney with "Intellectual Disability – Mild" and "Unspecified Anxiety Disorder."  He diagnosed Mr. Hackney with "Borderline Intellectual Functioning" and "Neurocognitive Disorder – post stroke."

121.   Dr. Lobb recommended that the Hackneys begin family therapy solely because of the stress CYF's interference with their family was causing them.

122.     As part of his assessment of the Hackneys, Dr. Lobb observed the Hackneys interact with K.H. for approximately one hour.  Even though the Hackneys had been permitted only minimal interaction with K.H. for at least a year, Dr. Lobb recorded that the Hackneys interacted with K.H. appropriately, *e.g.* by playing with blocks, helping her complete a puzzle, reminding her to keep her glasses on and allowing her to sit in their laps.  The Hackneys did not engage in any behavior that presented a risk of harm to K.H. or indicated that they were unable to safely care for her.

123.     As part of his assessment, Dr. Lobb interviewed both Jinkins and Lackey.  Lackey told him that during her visits, the Hackneys parented K.H. with little or no intervention from her and that she had no concerns about them.  Jinkins complained that the Hackneys required more prompting than any family she had ever worked with.  Lobb did not ask Jinkins whether she had ever worked with intellectually disabled parents before (she had not).

124.     Dr. Lobb found that CYF's placement of K.H. in foster care had interfered with her bonding with the Hackneys.  He believed that reunification was possible but was concerned about Lackeys' and Jinkins' differing views.  He recommended that they switch locations of their visits to determine whether the location of the visits was affecting the Hackneys' interactions with K.H.

125.     Dr. Lobb recommended that the Hackneys work with Achieva or another service for people with intellectual disabilities and that they have increased unsupervised visitation with K.H.

126.     On November 17, 2022, Lauren Hackney's attorney filed a motion to have the Hackneys' visits moved from Foster Parents' home to a neutral location.  The Court ordered that the Foster Parents not be in the same room during the Hackneys' visits with K.H. or that CYS move the visits to a different location.  CYF chose to keep the visits in the Foster Parents' home.

Exhibit A

Foster Parents continued to monitor the visits through a video baby monitor, making the Hackneys uncomfortable.

127.    In or about October of 2022, Lackey asked the new caseworker, Emma Embar, to observe a visit at the Hackneys' apartment, so that she could see how the Hackneys interacted with K.H. in their own home.  She told Embar that she was concerned that Foster Parents might be interfering with the Hackneys' visits.  Embar said she would observe a visit in the Hackneys' apartment but never did.

128.    In or about October of 2022, Lackey told Embar that the Hackneys were doing well and asked if they could have some unsupervised time during their visits in their apartment.  Embar told her the Hackneys unsupervised time had to occur during visits at Foster Parents' home.

129.    Another permanency review hearing was held on December 22, 2022.

130.    As of December 22, 2022, K.H. had been in foster care for over a year because of CYF's concerns about the Hackneys' disabilities.  Although CYF had finally had the Hackneys evaluated for disability-related services, CYF had not followed through with any of the recommendations.

131.    As of December 22, 2022, CYF was aware that the professionals who supervised the Hackneys' visits were providing vastly different descriptions of the Hackneys' parenting skills, that the professionals who observed the Hackneys outside of the Foster Parents' home had not observed any concerning behaviors and that the Hackneys were uncomfortable visiting with K.H. in the Foster Parents' home.  Nevertheless, as of December 22, 2022, no CYF employee had observed the Hackneys interact with K.H. anywhere other than the Foster Parents' home.

Exhibit A

132.    On information and belief, this was a deliberate attempt by CYF to suppress evidence that the Hackneys were able to parent K.H. without assistance and to facilitate the Foster Parents' adoption of K.H.

133.    At the December 22, 2022 hearing, Embar falsely testified that the Hackneys were on a waitlist for services from Achieva.  Embar testified that Achieva was "necessary based on the parents' limitations" and no other service providers would meet their needs.

134.    Even though Lobb had recommended increased visitation, Embar objected to any increase in unsupervised visits based solely on unfounded speculation that K.H. might climb on something and fall off while in the Hackneys' unsupervised care.

135.    Even though the Hackneys had not received disability-related parenting services which she believed were necessary, Embar testified that CYF intended to move to terminate the Hackneys' parental rights at the next hearing so that Foster Parents could proceed with adopting K.H.

136.    Following the December 22, 2022, hearing, the Court ordered CYF to move the Hackneys' visits from the Foster Parents' home to Adoption Connection's offices.

137.    In or about January of 2023, CYF reassigned the Hackneys' case to caseworker Monica Anderson-Rhone.  In connection with this reassignment, CYF held a transition meeting at which the caseworkers discussed CYF's goals and how CYF could move the case forward.  The meeting did not include discussion of ways to facilitate reunifying the Hackneys with K.H.

138.    At a hearing on February 1, 2023, Lauren Hackney's attorney asked the Court to toll the Adoption and Safe Families Act requirement that a child be permanently placed within 15 months because the Hackneys had not received disability-related services from Achieva which CYF had deemed necessary.

Exhibit A

139.    At this hearing Haney suggested for the first time that Achieva might not be necessary or helpful for the Hackneys.

140.    For over a year CYF had claimed that the Hackneys needed Achieva's services and had used the lack of those services as an excuse to delay reunification.  However, when CYF's failure to provide Achieva's services threatened to delay termination of the Hackneys' parental rights, CYF no longer believed that they were necessary.

141.    At the February 1, 2023 hearing Haney falsely testified that: 1) CYF had referred the Hackneys to Achieva in March of 2022; 2) CYF had confirmed that the Hackneys were on the waitlist in June or July and 3) CYF had reached out to Achieva multiple times to find out where the Hackneys were on the waitlist.

***The Court Ensures that the Record Reflects that CYF never referred the Hackneys to Achieva, but CYF Continues to Present False and Misleading Evidence***

142.    On February 5, 2023, Achieva's Associate Director informed Ms. Hackney's attorney that CYF had never referred the Hackneys to Achieva and that Achieva had no record of CYF having inquired about the Hackneys.

143.    On February 9, the court entered an order correcting the record to reflect that the Hackneys were never referred to Achieva and were never on a waitlist for Achieva's services.

144.    Another permanency review hearing was held on February 23, 2023.

145.    Between December 22, 2022 and February 23, 2023 Lackey continued to upload her notes into CYF's KIDS system and continued to try to contact CYF caseworkers to discuss the Hackneys' progress.  CYF caseworkers did not return her calls.

146.    At the February 23, 2023 hearing, the Hackneys' new CYF caseworker Anderson-Rhone testified that the Hackneys' intellectual disability issues would be addressed through a

referral to in home services which she had made earlier that week. She did not explain what in-home services the Hackneys would receive or how these services were related to the Hackneys' disabilities.

147.   Anderson-Rhone testified that that she had not spoken with Lackey about the Hackneys' progress and had not observed a visit at the Hackneys' home. She testified that she did not have any plans to observe the Hackneys in their home in the near future.

148.   Anderson-Rhone was unfamiliar with the case and could not answer the Hackneys' attorneys' questions. However, she testified that CYF had ongoing concerns about "feeding," and opposed additional unsupervised visitation until the Hackneys received disability-related services from Achieva. She was not able to explain what CYF's ongoing concerns about "feeding" were.

149.   CYF called Adoption Connection "Permanency Supervisor" Rebecca Birge to testify. Birge described several concerns about the Hackneys' parenting during supervised visits at the Adoption Connection offices. One of Birge's primary concerns was that the Hackneys pushed K.H. to continue eating after she said she was all done.

150.   CYF had removed K.H. from the Hackneys' custody ostensibly because they were not feeding her enough. Jinkins had previously testified that one of her primary concerns was that the Hackneys would give up on feeding K.H. when she said "all done," instead of pushing her to continue eating.

151.   The Hackneys were understandably frustrated by the continued scrutiny and criticism of their parenting and were confused about what CYF expected them to do.

152.   Following the February 23 hearing, over CYF's objections, the court ordered CYF to provide the Hackneys with limited unsupervised visitation in their apartment. Thereafter, the

Hackneys had a half hour of unsupervised visitation before and after each coached parenting session.

### *CYF moves to terminate the Hackneys' unsupervised visits with K.H. based on false and misleading allegations*

153.    On or about March 2, 2023, Anderson-Rhone observed a coached visit at the Hackneys' apartment.  This was the first time any CYF employee had observed a visit in the Hackneys' home.  Following the visit Anderson-Rhone did not express any concerns to Lackey or to the Hackneys' attorneys.  Nevertheless, on March 15, 2023, Anderson-Rhone filed a motion to terminate the Hackneys' unsupervised visitation.

154.    Anderson-Rhone alleged that the Hackneys had permitted K.H. to go outside alone and needed to be prompted to go outside with her.  In fact, K.H. had been on a fully enclosed balcony while Mr. Hackney played peek-a-boo with her from behind the balcony's curtains.  The Hackneys never left K.H. on the balcony unattended.

155.    Anderson-Rhone alleged that the Hackneys had violated court orders by feeding K.H. during their unsupervised time.  In fact, the Hackneys had simply allowed K.H. to finish eating her meal because they knew that if she returned to the Foster Parents hungry, Foster Parents would accuse them of not feeding K.H. enough.  Lackey had previously discussed this issue with Anderson-Rhone and Anderson-Rhone had not expressed any concerns about the Hackneys allowing K.H. to finish her meals during their unsupervised time.

156.    The court denied the motion without a hearing.

157.    On or about March 23, 2023, sixteen months after CYF removed K.H. from the Hackneys' custody because of their intellectual disabilities, Achieva began providing disability-related services to the Hackneys.

158.    Achieva Caseworker David Snyder met with the Hackneys during their weekly visits with K.H. at their apartment.  Snyder regularly provided notes from these meetings to CYF. Similar to Lackey, Snyder's notes reflected that the Hackneys were appropriately parenting K.H. with minimal input from him.

159.    Despite Snyder's reports that the Hackneys were able to parent K.H. without supervision, at a July 11, 2023 permanency review hearing CYF objected to any additional visitation until the Hackneys underwent another psychological assessment from Dr. Lobb.

160.    CYF requested that a hearing scheduled for October 17, 2023 be continued because Dr. Lobb had not completed his evaluation.

### *CYF knowingly presents psychological report based on incorrect and incomplete information*

161.    On December 05, 2023, Dr. Lobb provided CYF with an updated report regarding the Hackneys.

162.    Dr. Lobb had asked Anderson-Rhone for updated information about the Hackneys to aid him in completing his report.  Even though CYF had requested Lobb's report and was delaying additional visitation until it received the report, Anderson-Rhone did not provide Lobb with any updated information about the Hackneys.

163.    Lobb conducted another interactional observation of the Hackneys with K.H.  He reported that the Hackneys interacted with K.H. in developmentally appropriate ways,

164.    Lobb conducted seven interviews in connection with his report.  Six of these interviews were with service providers connected with Adoption Connections and Foster Parents. They all provided negative information about the Hackneys.

Exhibit A

165.    Lobb interviewed a worker from Family Resources who had been working with the Hackneys on budgeting and other life skills.  She told him that the Hackneys were doing well and that she did not have any concerns.

166.    Lobb did not interview David Snyder from Achieva, even though Snyder was the only provider responsible for assisting the Hackneys with their parenting skills.  Because he did not interview Snyder, Lobb was not aware that Snyder had consistently provided positive reports about the Hackneys' parenting.  Lobb later admitted that he should have interviewed Snyder and that his failure to do so was an "oversight."

167.    Lobb opined that the Hackneys should receive services from the Allegheny County Office of Developmental Supports (ODS).  The Hackneys had previously applied for ODS services at CYF's insistence and were rejected because their disabilities were not sufficiently limiting.

168.    Lobb opined that reunification of the Hackneys with K.H. was not feasible in the near future.

### CYF requests and receives Permanent Legal Custody with Foster Parents

169.    Although CYF received Lobb's report on December 5, 2023, Anderson-Rhone did not provide it to the Hackneys until January 4, 2024, after one of the Hackneys' attorneys called Dr. Lobb and inquired about its status.  Anderson-Rhone falsely told the Hackneys' attorneys that Dr. Lobb had "just sent" her the report.

170.    The Hackneys' counsel immediately notified CYF that Dr. Lobb had not interviewed David Snyder or anyone else from Achieva.  CYF did not ask for a revised report.

171.    On January 31, 2024, CYF presented Lobb's report at a permanency review hearing at which it requested that K.H. be permanently placed in the custody of Foster Parents.

Exhibit A

172.    CYF presented Lobb's report and conclusions knowing that 1) Lobb had not contacted Achieva, the disability-related service which CYF had insisted the family receive as a condition of reunification, and 2) Achieva would have provided information that supported reunifying K.H. with the Hackneys.

173.    On January 31, 2024, the court granted CYF's request to change K.H.'s permanency goal from reunification with the Hackneys to Subsidized Permanent Legal Custodianship with Foster Parents.  This change virtually ensures that K.H. will remain in the custody of Foster Parents for the remainder of her childhood, as originally planned by CYF, Adoption Connection and Foster Parents.

174.    Until January 31, 2024, K.H.'s permanency goal was "reunification."  However, CYF never established a plan to return K.H. to the Hackneys' custody and never provided the Hackneys with any articulable goals or standards to regain custody of K.H.  CYF simply made arbitrary and burdensome demands which caused the Hackneys severe emotional and financial hardship and which CYF changed as soon as the Hackneys complied.

175.    CYF never intended to return K.H. to the Hackneys because CYF believed K.H. would be better off with parents who did not have intellectual disabilities.

## COUNT I

**Substantive Due Process
Fourteenth Amendment to the United States Constitution
42 U.S.C § 1983
(Andrew and Lauren Hackney v. Individual Defendants)**

176.    All paragraphs are incorporated herein by reference.

177.    Defendants engaged in a coordinated scheme to permanently deprive the Hackneys of the custody of their daughter because of their intellectual disabilities.

Exhibit A

178.     Defendants' conduct, as described herein, violated the Hackneys' right to substantive due process by interfering with the integrity of their family in violation of the Fourteenth Amendment to the United States Constitution.

179.     Defendants' actions were taken in deliberate indifference to the Hackneys' Constitutional Rights.

180.     Defendants' actions shock the conscience.

## COUNT II

**Procedural Due Process**
**Fourteenth Amendment to the United States Constitution**
**42 U.S.C § 1983**
**(Andrew and Lauren Hackney v. Individual Defendants)**

181.     All paragraphs are incorporated herein by reference.

182.     Defendants' conduct, as described herein, violated the Hackneys' right to procedural due process by depriving the Hackneys of a meaningful opportunity to be heard by engaging in a covert scheme to present false negative information about the Hackneys' parenting abilities at court hearings;

183.     Defendants' conduct, as described herein, violated the Hackneys' right to procedural due process by depriving the Hackneys of a meaningful opportunity to regain custody of their daughter through clear, articulable, and consistent goals and standards for reunification.

## COUNT III

**Unconstitutional Custom, Policy or Practice**
**42 U.S.C. § 1983**
**(Andrew and Lauren Hackney v. Allegheny County)**

184.     All paragraphs are incorporated herein by reference.

Exhibit A

185.    Allegheny County, by engaging in a scheme to deprive the Hackneys of the custody of their daughter, which required the participation and cooperation and/or acquiescence of numerous Allegheny County employees through multiple levels of supervisions, adopted a custom, policy and/or practice which proximately caused the violation of the Hackneys' constitutional rights.

**COUNT IV**

**Failure to Train, Supervise, Discipline**
**or Adopt Necessary Policies**
**42 U.S.C. § 1983**
**(Andrew and Lauren Hackney v. Allegheny County)**

186.    All paragraphs herein are incorporated by reference.

187.    Defendant Allegheny County proximately caused the violations of the Hackneys' substantive and procedural due process rights as described herein by failing to properly train, supervise and/or discipline individual Defendants who engaged in a scheme to violate the Hackneys Constitutional rights by permanently depriving them of the custody of their daughter.

188.    Defendant Allegheny County failed to adopt policies necessary to ensure that:

    a.  Parents with intellectual disabilities are not deprived of their substantive due process right to family integrity because of their disabilities;

    b.  Parents' whose children are removed from their custody receive a meaningful opportunity to reunite with their children by receiving clear, articulable goals and standards for reunification with their children;

    c.  Parents' whose children are removed from their custody receive a meaningful opportunity to be heard at dependency hearings by being free from covert schemes by Allegheny County employees to present false negative information about their parenting abilities at such hearings.

189.    These policies were necessary for the administration of an adequate child welfare program.

Exhibit A

190.    The failure to adopt these policies proximately caused the violations of the Hackneys' constitutional rights to substantive and procedural due process, as hereinbefore described.

## COUNT V

**Conspiracy to Interfere with Civil Rights**
**42 U.S. Code § 1985**
**(Andrew and Lauren Hackney v. All Defendants)**

191.    All paragraphs herein are incorporated by reference.

192.    Defendants conspired for the purpose of depriving the Hackneys of the equal protection of the laws and/or equal privileges and immunities under the laws,

193.    Defendants conspired for the purpose of preventing or hindering authorities from giving or securing to the Hackneys the equal protection of the laws.

## COUNT VI

**Disability Discrimination**
**Age Discrimination in Employment Act**
**(Andrew and Lauren Hackney v. Allegheny County)**

**(As to Allegheny County)**

194.    All paragraphs herein are incorporated by reference.

195.    The Hackneys are qualified individuals with disabilities as that term is defined in the Americans with Disabilities Act.

196.    Allegheny County denied the Hackneys an equal opportunity to benefit from its programs, services, and activities, including but not limited to its child welfare program, by reason of their disabilities and/or otherwise subjected them to discrimination by reason of their disabilities, in violation of the Americans with Disabilities Act.

Exhibit A

197.    Allegheny County failed and/or refused to make reasonable modifications to its policies, practices, or procedures to accommodate the Hackneys' disability-related needs, in violation of the Americans with Disabilities Act.

198.    Allegheny County's actions, as described herein, deprived the Hackneys of the custody of their daughter and subjected the Hackneys to unnecessary financial hardship and emotional distress.

## COUNT VII

**Disability Discrimination
Section 504 of the Rehabilitation Act
(Andrew and Lauren Hackney v. Allegheny County))**

199.    All paragraphs herein are incorporated by reference.

200.    The Hackneys are qualified individuals with disabilities as that term is defined in Section 504 of the Rehabilitation Act.

201.    Allegheny County receives federal financial assistance.

202.    Allegheny County denied the Hackneys the opportunity to participate in its programs, services, and activities, including but not limited to its child welfare program, by reason of their disabilities and/or otherwise subjected them to discrimination by reason of their disabilities, in violation of Section 504 of the Rehabilitation Act.

203.    Allegheny County failed and/or refused to make reasonable modifications to its policies, practices, or procedures to accommodate the Hackneys' disability-related needs, in violation of Section 504 of the Rehabilitation Act.

204.    Allegheny County's actions, as described herein, deprived the Hackneys of the custody of their daughter and subjected the Hackneys to unnecessary financial hardship and emotional distress.

Exhibit A

**Prayer for Relief**

WHEREFORE, the Hackneys respectfully request that judgment be entered in their favor

and against Defendants as follows:

(i)      Actual and special damages as to all Counts,

(ii)     Compensatory damages as to all Counts,

(iii)    Punitive damages as to Counts against individual Defendants,

(iv)    Declaratory and injunctive relief as to all Counts,

(v)     Attorney's fees and costs as to all Counts,

(vi)    All other relief as this Court deems just and proper.


Respectfully submitted,

/s/ Margaret S. Coleman
PA ID# 200975

Alec B. Wright, Esquire
PA ID# 316657

O'BRIEN, COLEMAN & WRIGHT, LLC
116 Boulevard of the Allies
Pittsburgh, PA  15222
(412) 232-4400

Attorneys for Plaintiff

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

_____ County

| For Prothonotary Use Only: | |
|---|---|
| Docket No: | *TIME STAMP* |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**S E C T I O N   A**

**Commencement of Action:**
☐ Complaint          ☐ Writ of Summons          ☐ Petition
☐ Transfer from Another Jurisdiction          ☐ Declaration of Taking

Lead Plaintiff's Name: | Lead Defendant's Name:

**Are money damages requested?  ☐ Yes     ☐ No** | Dollar Amount Requested:     ☐ within arbitration limits
(check one)     ☐ outside arbitration limits

**Is this a *Class Action Suit*?     ☐ Yes     ☐ No** | **Is this an *MDJ Appeal*?     ☐ Yes     ☐ No**

Name of Plaintiff/Appellant's Attorney: _____

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**Nature of the Case**:     Place an "X" to the left of the **ONE** case category that most accurately describes your **_PRIMARY CASE._** If you are making more than one type of claim, check the one that you consider most important.

**S E C T I O N   B**

**TORT** *(do not include Mass Tort)*
☐ Intentional
☐ Malicious Prosecution
☐ Motor Vehicle
☐ Nuisance
☐ Premises Liability
☐ Product Liability *(does not include mass tort)*
☐ Slander/Libel/ Defamation
☐ Other:
_____
_____

**MASS TORT**
☐ Asbestos
☐ Tobacco
☐ Toxic Tort - DES
☐ Toxic Tort - Implant
☐ Toxic Waste
☐ Other:
_____
_____

**PROFESSIONAL LIABLITY**
☐ Dental
☐ Legal
☐ Medical
☐ Other Professional:
_____
_____

**CONTRACT** *(do not include Judgments)*
☐ Buyer Plaintiff
☐ Debt Collection: Credit Card
☐ Debt Collection: Other
_____
_____
☐ Employment Dispute: Discrimination
☐ Employment Dispute: Other
_____
_____
☐ Other:
_____
_____

**REAL PROPERTY**
☐ Ejectment
☐ Eminent Domain/Condemnation
☐ Ground Rent
☐ Landlord/Tenant Dispute
☐ Mortgage Foreclosure: Residential
☐ Mortgage Foreclosure: Commercial
☐ Partition
☐ Quiet Title
☐ Other:
_____
_____

**CIVIL APPEALS**
Administrative Agencies
☐ Board of Assessment
☐ Board of Elections
☐ Dept. of Transportation
☐ Statutory Appeal: Other
_____
_____
☐ Zoning Board
☐ Other:
_____
_____

**MISCELLANEOUS**
☐ Common Law/Statutory Arbitration
☐ Declaratory Judgment
☐ Mandamus
☐ Non-Domestic Relations Restraining Order
☐ Quo Warranto
☐ Replevin
☐ Other:
_____
_____

**Exhibit A**

*Updated 1/1/2011*

# NOTICE

**Pennsylvania Rule of Civil Procedure 205.5. (Cover Sheet) provides, in part:**

**Rule 205.5.    Cover Sheet**

(a)(1)    This rule shall apply to all actions governed by the rules of civil procedure except the following:

(i)    actions pursuant to the Protection from Abuse Act, Rules 1901 et seq.

(ii)    actions for support, Rules 1910.1 et seq.

(iii)    actions for custody, partial custody and visitation of minor children, Rules 1915.1 et seq.

(iv)    actions for divorce or annulment of marriage, Rules 1920.1 et seq.

(v)    actions in domestic relations generally, including paternity actions, Rules 1930.1 et seq.

(vi)    voluntary mediation in custody actions, Rules 1940.1 et seq.

(2)    At the commencement of any action, the party initiating the action shall complete the cover sheet set forth in subdivision (e) and file it with the prothonotary.

(b)    The prothonotary shall not accept a filing commencing an action without a completed cover sheet.

(c)    The prothonotary shall assist a party appearing pro se in the completion of the form.

(d)    A judicial district which has implemented an electronic filing system pursuant to Rule 205.4 and has promulgated those procedures pursuant to Rule 239.9 shall be exempt from the provisions of this rule.

(e)    The Court Administrator of Pennsylvania, in conjunction with the Civil Procedural Rules Committee, shall design and publish the cover sheet.  The latest version of the form shall be published on the website of the Administrative Office of Pennsylvania Courts at www.pacourts.us.

Exhibit A